Filed 7/6/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ADELANTO ELEMENTARY SCHOOL DISTRICT, | D086337 |
| Plaintiff and Respondent, | (Super. Ct. No. CIVBA2400679) |
| v. | |
| MICHAEL KRAUSE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Bernardino County, James Baxter, Judge.  Affirmed as modified.

Briggs Law Corporation and Cory J. Briggs for Defendant and Appellant.

McCune & Harber and Dominic A. Quiller for Plaintiff and Respondent.

Michael Krause, a former superintendent of the Adelanto Elementary School District (District), appeals from an order granting the District's request for a workplace violence restraining order (WVRO) against him on behalf of three of its employees.  (Code Civ. Proc.,[1] § 527.8.)  Krause, who is now an elected member of the District's Board of Trustees (Board), contends

_____

[1]    Undesignated statutory references are to the Code of Civil Procedure.

1

that the District waived its right to seek a WVRO as part of an employment separation agreement releasing any existing claims against him. We conclude that, even assuming the release would apply to a WVRO proceeding, an employer's right to prosecute a WVRO on behalf of its employees is unwaivable under Civil Code section 3513. We also find sufficient evidence of a future threat of harassment to support the WVRO, and we reject Krause's contention that the WVRO violates his parental rights. We conclude, however, that one portion of the WVRO is overbroad and violates Krause's First Amendment rights as an elected Board member by prohibiting him from making any comment on the WVRO or the WVRO proceedings at regular Board meetings. Accordingly, we will modify the WVRO to vacate this provision. We also modify the WVRO by limiting its duration to the statutory maximum of three years, rather than four years as ordered by the trial court, subject to early termination under the terms of the original order. (See § 527.8, subd. (l)(1).) We affirm the order as so modified.

FACTUAL AND PROCEDURAL BACKGROUND

*A. Krause's Interactions with S.A., X.L., and I.P.*

S.A. and I.P., executive assistants for District assistant superintendents, began working with Krause in July 2022 when he was the District's Chief Business Officer. When the District hired Krause to be its superintendent in January 2023, X.L. worked as his executive assistant. S.A., I.P., and X.L.'s duties require them to actively participate in meetings of the District's Board. For example, they prepare materials and agendas, order food, and interact frequently with Board members and the superintendent.

When Krause worked for the District, S.A., X.L., and I.P. all observed him angrily shouting at coworkers and threatening employees with termination if they did not go along with his agenda. During these

2

"tantrums," his face would turn red and he would "stomp about the room, yelling, shaking his fists," and pounding his chest. In one incident in April 2023, Krause got irritated by questions in a meeting regarding employee compensation for a snow day. His face got red and he "slammed his canned beverage and fist down on the table in front of him[,]" causing the drink to splatter. He slammed his fists down on the table again, "screaming" that he made the decisions, anyone who disagreed could leave, and he was "tired of having [his] decisions questioned." Krause paced around the room, demanding that everyone answer that they understood him, until many in the room were in tears.

S.A., X.L., and I.P. each received texts messages from Krause that made them feel uncomfortable. For example, in July 2022, Krause texted S.A., "how was Walmart last night?" along with a laughing emoji, and "You were by the pets section." S.A. had actually been at Walmart the night before, but she did not see Krause and he did not make himself known to her.

In January 2023, Krause sent X.L. unsolicited photos of the inside of the hotel room she booked for him at a conference. A few months later in April and May 2023, Krause sent I.P. and X.L. photos of himself in military uniform on his way to military training.

Then in August 2023, Krause sent X.L. a photo of himself at the mall after work hours, with the caption "Mr. K was seen at the mall by himself tonight. Scandalous." After texting a picture of his dinner to X.L., Krause said, "You don't like me anymore" with a frowning emoji, followed by, "You have been away so long you forgot your boss."

One evening in September 2023, S.A. was setting up food for a Board meeting in the conference room in Krause's office when a custodian entered the room. S.A. immediately received a text from Krause asking, "Everything

3

okay?" When S.A. responded that she was setting up food, Krause texted back, "You got help LOL[.]" S.A. soon realized that Krause was using cameras in his office to watch her. When S.A. asked if he was watching her "on the cameras," Krause texted back, "ha ha [X.L.] is a spy."

Later that same month, Krause sent X.L. eight separate text messages one afternoon, all in one minute: "Hello," "Hi," "Hola," "Hey," "Bueno [*sic*] Dias," "I am so unloved today," "My [X.L.] hasn't texted me," and "[frowning emoji]." A few weeks later when X.L. asked Krause whether she should release a work-related photograph, Krause responded "Please release me . . . let me go. . . . I don't love you anymore."

In late September 2023, Krause responded to a photo of S.A. posing in a company shirt by texting both S.A. and X.L. and asking if S.A. was on drugs, followed by three laughing emojis. S.A. found this to be unprofessional and disrespectful.

Then in October 2023, S.A. was waiting in line at a Chipotle when Krause sent her and several other coworkers a text message containing a photograph of S.A. standing in the line. His text said, "We saw a strange person at Chipotle. Police have been notified. They ordered spicy food [laughing emoji]." S.A. immediately looked around but did not see Krause, and he did not make himself known to her. After that incident, because S.A. lived close to Krause, she was afraid to go to local restaurants or businesses alone and felt the need to "constantly look over [her] shoulder for Krause."

The following week, S.A. was standing in the back of the room during a staff meeting when Krause approached her from the side without warning and poked her hard in the shoulder three times with his finger. He then "quietly, but very intensely" told S.A., "Your mistakes are killing me!" S.A.

4

was frightened, confused, and startled by the painful jabbing, and she began to cry. Krause quickly left the room.

Later in October 2023, Krause texted X.L. a photo of her house at night taken from the street outside, showing a blue light on in the upstairs window. According to X.L., Krause texted, "did you know you left the blue light on?" This frightened X.L. because she had never invited Krause to her home before.

In November 2023, Krause texted X.L. during the workday saying that the door to her office had been left open, that she had "been missing for an hour," and to "come home soon," "we miss you." Earlier that month, he also sent I.P. a close-up picture he took of her face during a meeting. The next day, he texted I.P. a cropped photo of her face from the District's website with no accompanying text or explanation. Then at the end of the month, Krause texted I.P. before work hours to ask if she could pick him up at his "girlfriends [*sic*] house." This made I.P. uncomfortable because Krause lived approximately 35 miles away from I.P. and was married at the time.

In December 2023, Krause took another photo of I.P. during a meeting and texted it to her, saying "found you. you were trying to hide LOL." Until she saw his text message, she did not know he was watching her, or that he took the picture. At some point that month he "barged" into I.P.'s office and asked her and X.L. if they had received his text messages, at which point I.P. told him to stop sending "harassing texts" and to stop texting her after school hours. The next month, when X.L. did not respond immediately to Krause's text messages, he sent her a frowning emoji, then texted, "You have been distant."

Krause's behavior continued into January 2024 when he texted I.P. a photo from outside of her husband's workplace at a prison and texted her

5

photos of signs and streetlights in her Barstow neighborhood. The text accompanying the photos from her neighborhood said: "visited my special friend last night in Barstow." I.P. was "very disturbed" that Krause sent photos from locations so close to her home, especially because he lived far away. In February 2024, Krause texted I.P. and an assistant superintendent a photo of a sign in Barstow, and when I.P. asked what he was doing in town, he said: "I am enjoying my sour dough bread as I watch [I.P.'s family] head to Los Domingo's [sic]," a Barstow restaurant. I.P. and her husband were actually at Los Domingos when she received Krause's text. Around that time, I.P. became convinced Krause was following her.

A few days after a February 2024 budget meeting in which Krause's financial decisions were critiqued, Krause approached X.L. and poked her repeatedly in the arm with his finger, stating that he knew a certain employee was "the mole" who "ratted him out" to Board members. X.L. was startled by the poking, which was painful.

In March 2024, X.L. and I.P. reported Krause's behavior to two members of the Board. Krause was placed on administrative leave in early April 2024. About a week later, X.L. and I.P. were getting coffee at Starbucks near X.L.'s house when they saw Krause parked outside, sitting in his car and staring at them. They were frightened and left immediately.

None of the women had any direct contact with Krause after he was put on leave. But shortly after Krause was placed on leave, he filed a sexual harassment claim against X.L. According to X.L., the District investigated and concluded the allegations were unfounded.

When X.L., S.A., and I.P. learned about each other's similar experiences with Krause, they reported his conduct to the police in early

6

May 2024. They each said they were afraid to come forward earlier because Krause often said that "if he went down," so would they.

B. *Krause's Termination and Board Campaign*

The District terminated Krause on June 30, 2024. Krause and the District signed a "Separation Agreement and General Release" (Separation Agreement) which provided, among other things, that the parties had "mutually elected to end his employment" with the District "without cause." Paragraph 10 of the Separation Agreement required that Krause "stay away and not come upon DISTRICT property nor contact DISTRICT employees, during work hours, or trustees in any form or any manner whatsoever, except as may be necessary to participate in public meetings of the board of trustees as allowed by law or to exercise any parental rights he may have for his child(ren) while attending district schools." Paragraph 14 of the Separation Agreement provided as follows:

> "Release by the DISTRICT. The DISTRICT hereby releases and discharges KRAUSE from any and all actions, causes of action, claims, demands, damages, compensation, costs, expenses, and attorney fees, whether or not contingent, unliquidated, or unmatured, known or unknown, arising out of, concerning, resulting from, or relating to KRAUSE'S employment with the DISTRICT."

Paragraph 20 of the Separation Agreement states:

> "Successors and Assigns. This Agreement shall inure to the benefit of and shall be binding upon each of the Parties here and their respective agents, representatives, executors, administrators, trustees, personal representatives, partners, directors, officers, shareholders, agents, attorneys, insurers, employees, representatives, predecessors, successors, heirs, and assigns."

In the months immediately following his June 2024 termination, Krause ran for a seat on the District Board and was elected in November

7

2024. During his campaign, S.A., X.L., and I.P., each saw one of his campaign signs placed close to their homes, even though I.P. and X.L. do not live in the area for which Krause was running. Each of the women believed the placement of the signs was an intimidation tactic. While Krause was running, his campaign manager also posted a document on social media containing details about Krause's sexual harassment claims against X.L. The document consisted of an internal e-mail from Krause to a District human resources supervisor. Krause knew about the social media post, but did not ask his campaign manager to take it down.

### C. WVRO Petition and TRO

In October 2024, the District petitioned for a WVRO against Krause on behalf of S.A., X.L., and I.P. The trial court issued a temporary restraining order (TRO) on October 15, 2024.

As a newly elected Board member, Krause attended a January 2025 Board meeting remotely, while the TRO was still in effect.[2] At one point in the meeting, Krause apparently made negative comments about the restraining order, describing it as "shameful" and asking the Board to "do away with" their legal counsel.[3]

The court later modified the TRO while WVRO proceedings were pending to allow Krause to attend Board meetings in person, provided that

---

[2] Krause's own testimony, comments by the trial court on the record, and the register of actions indicate that a TRO was issued and in effect in January and March 2025. Those orders, however, are not included in the record.

[3] A video from this Board meeting was shown to the trial court and marked as "Exhibit AA," but the exhibit was never formally admitted into evidence and is not part of the record on appeal.

he had at least one escort with him at all times. The District offered to hire security personnel to accompany Krause, which he did not object to.

*D. WVRO Hearing and Defense Evidence*

The trial court held a WVRO hearing over the course of four days in January and March 2025. The District presented X.L., I.P., S.A. as witnesses. All three women testified to the events described above and confirmed that they have sought mental health treatment in connection with Krause's behavior. They each expressed fear that he would retaliate against them for reporting him to the District, and they stated that they feared for their own safety and the safety of their families.

The defense called Tailor Titus, Krause's campaign manager, who testified that she decided where to place campaign signs and that the three women were not deliberately targeted. She also testified about posting Krause's e-mail containing sexual harassment allegations against X.L. on social media. Another defense witness, Angelique Jolly, testified that in her role as a teacher and union member in the District, she had never witnessed Krause acting in an unprofessional manner.

Krause testified that X.L. asked him to send her photos of his hotel room so she could see "if the accommodations were up to par, in order for her to potentially reserve that hotel again in the future." He said he took the photo outside of X.L.'s house and sent it to her because the Board's president, with whom he was driving after a school function, directed him to go there. He "would take pictures of landmarks, street signs, maybe stores," and send the photos to the three women "just to let them know" that he was in their area. He sent the women selfies in military garb because he thought "they would want to see what it looked like" when he was on base. Regarding the photo from outside of the prison where I.P.'s husband works, Krause said

9

that he was sometimes invited by the warden to have lunch there and that I.P. said Krause should let her know when he was at the prison. He said he was joking when he asked I.P. to pick him up at his "girlfriend's" house.

Krause denied that he ever poked X.L. or S.A. As for the snow day meeting during which he allegedly screamed at his subordinates, Krause described his tone as "authoritative," which he then reenacted for the court.[4] He testified that his face turns red not because he feels angry or guilty, but because he has an undiagnosed medical condition that causes him to have a red complexion sometimes, even when relaxed. He denied seeing X.L. and I.P. at Starbucks soon after he was placed on leave, and he denied ever following them. He told the court about gifts and cards the three women had given him for his birthday and "Boss's Day."

Although Krause said he did not recall sending some of the photos, he did not deny sending the three women texts and selfies after work hours. He repeatedly asserted his texts and photos were appropriate because he had taken "hundreds of pictures and shared them with the group," and "at no time" did anyone ever ask him to stop or tell him his texts were not appropriate. When asked about the close-up photos of I.P. that he texted to her, Krause said he was reviewing the District's public website because there was no public information officer at the time, and he was asking employees if they wanted to change their photos. He "would take pictures of a lot of people" and "if [I.P.] was in them, she was in them, or any of the other ladies, but it wasn't to directly target any particular person" when he took photos. When asked whether it was appropriate to text a photo at 9:15 p.m. to a

---

4    The record indicates that Krause's testimony was recorded, but the recording is not part of the record on appeal.

10

subordinate, he responded, "Yes, because they were awake" and employees "would talk all hours of the evening so it was appropriate in [his] mind."

As for the photos in Barstow where I.P. lived, he said he often sent photos to friends when he was in their neighborhoods for business, and that he had "a history of doing this . . . sending photos of areas, landmarks, and things." He testified that I.P. had invited him to Los Domingos that day "knowing [he] was going to Barstow at the time" and that he "had no idea" they were there. He also asserted that he had "no idea what they drive, where they live, what they look like," even though I.P. had given him a ride in her car. When asked why he texted I.P. that he was "watching" her family go to Los Domingos, he said it was "a joke" and that he did not see I.P.'s family that day.

Regarding the group text message asking if S.A. was on drugs, Krause said he sent that because S.A. "was emotional" about her husband being "on his death bed" and had been acting "erratic." He told the court that S.A. "was on prescription meds," and that the smiling emojis he included in the text were in reference "to something else that was farther up in the text message."

When the District's attorney asked Krause to describe his sexual harassment complaint against X.L., Krause responded twice that he did not have the complaint "in front of [him]." The attorney asked Krause, "So you're telling the Court that you filed a claim for sexual harassment, which is pretty serious . . . and you don't remember what you accused [X.L.] of doing?" Krause responded, "I would have to look at the document in front of me."

The defense called as its last witness Jennifer Rader, the president of the teachers' union. Rader testified that when Krause was suspended in April 2024, the Board tasked her with asking "every department in the District office" to inquire about employees' opinions of Krause. She said that

11

those she talked to "liked him just fine" and that she did not hear any negative criticisms. She also denied calling Krause "a creep" or "a bully." During her investigation, Rader did not speak to S.A., X.L., or I.P.

E. *The District's Rebuttal Witnesses*

The District called Victorville city council member Debra Jones as a rebuttal witness. Jones testified that while Rader publicly supported Krause in his candidacy for the Board, she privately told Jones that Krause was "not to be trusted" and that he was "a creep." Jones said that in her experience, Krause "is not a man of integrity and self-serving." For example, in the process of interviewing him for a commissioner position, Jones learned that Krause had been sued for harassment or defamation during his tenure on a different board, but he failed to disclose that in the interview and did not include that board membership on his resume.

X.L. took the stand again to describe the impact of Krause's comments at recent Board meetings. For example, Krause said during a public Board meeting in March 2025 that his "team" had hired the security personnel who accompanied him to the meeting, even though the court required it and it was the District who had hired security. X.L. said this gave the impression "that it was his decision to have security there as if [S.A., X.L., and I.P. were] the problem," which made them "feel like criminals." X.L. also testified that when she saw Krause's comments at the January 2025 meeting, specifically when he said that the Board should "do away with" their legal counsel in this proceeding, she felt that "what [the women were] going through, it means nothing," and she felt like they "were not abused." At a recent Board meeting, Krause also attempted to explain the picture he took outside of X.L.'s home and called out the cost of a chair X.L. had purchased for work, which made her feel "personally attacked" and "bullied." She denied ever

12

consenting to, or asking for, the photos from Krause that were at issue in the proceedings.

I.P. also took the stand again and testified that Krause's comments during the January 2025 Board meeting made her feel "disrespected" and like she was "a liar." She denied inviting Krause to Los Domingos on the day he texted that he was watching her.

S.A. testified in rebuttal that the poking incident did occur, and that she told her superior at the time it happened.

Lastly, the District called Richard Krejckant to the stand to testify about the April 2023 snow day meeting. Krejckant, who provided a declaration in support of the TRO, confirmed that Krause slammed his fists on the table during that meeting and "got a little red in the face." Krejckant said Krause's voice "got real loud," which Krejckant demonstrated for the court.

## F. WVRO After Hearing

After reviewing the evidence and hearing arguments from the parties, on March 19, 2025, the trial court granted a WVRO prohibiting Krause from harassing, disturbing the peace of, or contacting directly or indirectly in any way, S.A., X.L., and I.P. The court also ordered that Krause stay at least 100 yards away from each of the women and their workplace, but the WVRO provides that Krause "may attend regular and specially called Board meetings" and that he could be on District property for "official functions," provided he gives the District superintendent 48 hours notice of where and when he will be attending such functions, and that he be "accompanied by a school administrator while on school premises." The restraining order requires that while at Board meetings, Krause "shall stay at least 5 yards away" from the protected parties, and that a security guard must to be

13

present during Board meetings at the District's expense. The WVRO prohibits Krause from commenting on the order, or the WVRO proceedings, "at or on the record of any regular Board meeting." The order states that it "shall have a duration of four (4) years, subject to early termination upon proper Motion in the event [Krause] is no longer a member of the District Board" and "not otherwise associated with the school district[.]"

In granting the order, the trial court found that Krause's conduct in the case did not constitute "the typical violence or threats of violence" often seen in restraining order cases, but instead "has to do with this course of conduct portion of the code." The court characterized Krause's explanations of his behavior as "feasible" at times and "strained" at others. Although the court described Krause's conduct as "subtle," it said it could "see why it would be found disturbing." The court considered Krause's "lack of remorse" relevant to determining there was a likelihood of future harm, and it observed that Krause "reinserting himself in a position where these women would be subordinate to him shows that he is willing and . . . wanting to continue to put himself in this circle of people." The court concluded that the District "met their burden of proof with respect to the potential for future harm."

DISCUSSION

Krause argues on appeal that: (1) the District waived its right to seek a WVRO when it signed the Separation Agreement with a general release of claims; (2) there was insufficient evidence of a reasonable probability of future harm; (3) the WVRO violates Krause's parental rights; (4) one provision of the WVRO is overbroad and violates his First Amendment rights under the United States Constitution; and (5) the WVRO's four-year duration violates section 527.8. We reject Krause's first three arguments but agree with the last two. Accordingly, we modify the WVRO to delete the overbroad

14

provision and limit the WVRO's duration to the statutory maximum of three years, subject to early termination under the terms of the original order. As so modified, we affirm the order.

I

*An Employer's Right to Prosecute a WVRO on Behalf of its Employees is Unwaivable Under Civil Code Section 3513*

Krause argues that the District waived its right to seek a WVRO when it signed the Separation Agreement with the general release. He contends that the release of claims precluded the District from seeking a WVRO because it applied to any events relating to Krause's employment with the District through June 30, 2024, the date of the Agreement. Because the majority of Krause's alleged misconduct occurred before that date, and because the Separation Agreement contains a successors-and-assigns provision making it binding on the District's employees, Krause argues that the District was prohibited from using evidence predating the Separation Agreement to support a WVRO petition and that any evidence of later conduct was insufficient to support the petition.

In its respondent's brief, the District asserted several different arguments, including that enforcing the release to preclude the District from seeking a WVRO would be against public policy under Civil Code section 1668.[5] In evaluating this public policy issue, we requested and received supplemental briefing from the parties on whether an employer's waiver of

_____

[5] Civil Code section 1668 provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

15

the right to prosecute a WVRO would violate Civil Code section 3513, a closely related statute also derived from public policy. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 100 (*Armendariz*) [observing that the "unwaivability" of certain statutory rights "derives from two statutes that are themselves derived from public policy," i.e., Civil Code sections 1668 and 3513].) We now conclude that an employer's right to prosecute a WVRO on behalf of its employees is unwaivable under Civil Code section 3513.[6]

Civil Code section 3513 provides: "Anyone may waive the advantage of a law intended solely for their benefit. But a law established for a public reason cannot be contravened by private agreement."

As our Supreme Court has explained, "[s]ome public benefit is . . . inherent in most legislation" and the "pertinent inquiry" under section 3513 "is not whether the law has any public benefit, but whether that benefit is merely incidental to the legislation's primary purpose." (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1049.) A party may waive a statutory right if its public benefit is merely incidental to its primary purpose, but a waiver is unenforceable where it would seriously compromise any public purpose the statute was intended to serve. (*Azteca Construction, Inc. v. ADR Consulting,*

---

6      In his briefing and supplemental briefing, Krause did not argue that the public policy issue under these Civil Code provisions was forfeited by the District's failure to assert it in the trial court. Notwithstanding any possible forfeiture, we exercise our discretion to decide this issue for the first time on appeal because it presents a pure issue of law based on undisputed facts and involves a matter of important public policy. (See *Adams v. Murakami* (1991) 54 Cal.3d 105, 115, fn. 5 ["a reviewing court has discretion to decide such an issue if it presents a pure question of law arising on undisputed facts, particularly when the issue is a matter of important public policy"].)

16

*Inc.* (2004) 121 Cal.App.4th 1156, 1166.) "Stated another way, Civil Code section 3513 prohibits a waiver of statutory rights where the 'public benefit [of the statute] is one of its primary purposes.' " (*Ibid.*, quoting *DeBerard Properties v. Lim* (1999) 20 Cal.4th 659, 669.)

In *Armendariz*, our Supreme Court held that "the statutory rights established by the FEHA [Fair Employment and Housing Act] are 'for a public reason' " and are therefore unwaivable under Civil Code section 3513. (*Armendariz, supra*, 24 Cal.4th at pp. 100–101.) The court reasoned that the fundamental public policy against employment discrimination " 'is plainly one that "inures to the benefit of the public at large rather than to a particular employer or employee." ' " (*Id.* at p. 100.) " 'No extensive discussion is needed to establish the fundamental public interest in a workplace free from the pernicious influence of [discrimination].' " (*Ibid.*) The Supreme Court later concluded that the right to bring a *Tameny* claim[7] for termination of employment in violation of public policy is also unwaivable because it "is designed to protect a public interest." (*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1077.)

We conclude that an employer's statutory right to bring a WVRO on behalf of its employees (§ 527.8, subd. (a)) is similarly unwaivable because this right was not "intended solely" for the employer's benefit and was "established for a public reason." (Civ. Code, § 3513.) By its terms, the WVRO statute is not intended solely for the employer's benefit. Section 527.8, subdivision (a) authorizes an employer to seek a WVRO *on behalf of the employee* who has suffered workplace-related harassment, unlawful

---

7     *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167.

17

violence, or a credible threat of violence.[8]  (Italics added.)  Moreover, the Legislature enacted this law to address a societal issue of growing public concern: "The express intent of the author of the legislation was to address the growing phenomenon in California of workplace violence by providing employers with injunctive relief so as to *prevent* such acts of workplace violence." (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 334 (*Scripps Health*) [citing legislative history].)

When read together with provisions of the Labor Code that require employers to maintain a safe workplace (Lab. Code, §§ 6400-6406), the WVRO statute "establish[es] an explicit public policy requiring employers to provide a safe and secure workplace, including a requirement that an employer take reasonable steps to address credible threats of violence in the workplace." (*Franklin v. The Monadnock Co.* (2007) 151 Cal.App.4th 252, 259 (*Franklin*); see also *City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 336–337 [same].)  This "is a fundamental and substantial public policy." (*Franklin*, at p. 260.)  Moreover, this policy does not just benefit the direct victims of workplace violence or harassment; it also "inure[s] to the benefit of the public" because it "serve[s] the public interest in promoting workplace safety, the interest in deterring workplace crime, and the interests of innocent coworkers who could have suffered harm." (*Id.* at p. 263.)

As the *Franklin* court explained: " 'Clearly, violence in the workplace affects society as a whole.  The economic cost, difficult to measure with any

---

[8]	The statute also permits an employee's "collective bargaining representative" to seek a WVRO "on behalf of the employee."  (§ 527.8, subd. (a).)

precision, is certainly substantial.  There are intangible costs too.  Like all violent crime, workplace violence creates ripples that go beyond what is done to a particular victim.  It damages trust, community, and the sense of security every worker has a right to feel while on the job.  In that sense, everyone loses when a violent act takes place, and everyone has a stake in efforts to stop violence from happening.' " (*Franklin, supra*, 151 Cal.App.4th at p. 265, fn. 9.)

Workplace violence has only become an issue of greater public concern in the two decades since *Franklin* was decided.  As explained in the legislative history of a 2023 amendment to section 527.8 expanding the statute to cover harassment: "While workplace violence and harassment is not new, the issue has risen to the forefront of collective consciousness in recent years.  Since the onset of the coronavirus pandemic, workers across industries have been harassed and threatened for enforcing mask mandates, and, despite being praised as heroes during the early day of the pandemic, health workers have faced a constant barrage of abusive behaviors. . . .  [¶] Similar trends have arisen in the area of education. . . .  In October 2021, Attorney General Merrick Garland released a memo vowing to develop strategies to address harassment and intimidation of school board members, teachers, and public school workers. . . .  Election workers have also experienced escalating threats of violence, as well as violence, while trying to do their jobs, since the 2020 presidential election." (Sen. 3d Reading analysis of Sen. Bill No. 428 (2023-2024 Reg. Sess.) as amended Sept. 8, 2023, pp. 1–2.)  Thus, the WVRO statute addresses a vital issue of public concern affecting matters as varied as the delivery of healthcare and education and even the conduct of elections.

Just as FEHA rights are unwaivable because allowing a waiver would undermine the fundamental public interest in a workplace free from the pernicious influence of discrimination (*Armendariz, supra*, 24 Cal.4th at p. 100), so too a waiver of an employer's statutory right to prosecute a WVRO would undermine the fundamental public interest in combatting workplace violence, threats, and harassment. A waiver of the right to prosecute a WVRO would deprive the employer of an important tool the Legislature has supplied to counter threats to workplace safety. Civil Code section 3513 prohibits such a waiver because this tool is not intended solely for the employer's benefit; combatting workplace violence, threats, and harassment is a primary public purpose of the WVRO statute; this fundamental public policy inures to the benefit of the public at large; and it is not merely an incidental benefit of the statute.[9] Accordingly, we reject Krause's argument that the District waived its right to prosecute a WVRO on behalf of its employees.

## II

*There is Sufficient Evidence of a Future Threat of Harassment*

We next consider Krause's argument that there is insufficient evidence to show the likelihood of future harm. A trial court's factual findings on the elements necessary for a restraining order are reviewed for substantial evidence. (*Technology Credit Union v. Rafat* (2022) 82 Cal.App.5th 314, 323.) We "view the record in the light most favorable to the prevailing party below

---

[9] For these reasons, we are not persuaded by Krause's argument that Civil Code section 3513 is not implicated merely because section 527.8 provides optional remedies to an employer to supplement an individual's right to obtain a civil harassment restraining order under section 527.6.

20

and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

Section 527.8, subsection (k), provides that "[i]f the judge finds by clear and convincing evidence that the respondent engaged in harassment, engaged in unlawful violence, or made a credible threat of violence, an order shall issue prohibiting further harassment, unlawful violence, or threats of violence." Subdivision (b)(4) defines "harassment," in relevant part, to include "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose[,]" causing substantial emotional distress.[10]

Krause does not challenge the trial court's determination that his past actions constituted a harassing course of conduct as to each of the three women.[11] He focuses instead on the sufficiency of evidence that he poses a *future* threat of harm. Quoting this court's 1999 decision in *Scripps Health*,

---

[10]    The statute further defines "course of conduct" to mean "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an employee to or from the place of work; entering the workplace; following an employee during hours of employment; making telephone calls to an employee; or sending correspondence to any employee by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or computer email." (§ 527.8, subd. (b)(1).)

[11]    Although a number of the acts of harassment took place when the victims were off campus, Krause does not dispute that his course of conduct "can reasonably be construed to be carried out or to have been carried out at the workplace . . . ." (§ 527.8, subd. (a).) Because this issue has not been raised on appeal, we do not decide the question.

Krause contends there is insufficient evidence "that great or irreparable harm would result to an employee if a prohibitory injunction were not issued due to the reasonable probability *unlawful violence* will occur in the future." (*Scripps Health, supra*, 72 Cal.App.4th at p. 335, italics added.)

We reject Krause's reliance on this standard for assessing the threat of future harm under the current version of the WVRO statute. When *Scripps Health* was decided in 1999, the statute was limited to acts of " 'unlawful violence or a credible threat of violence.' " (*Scripps Health, supra*, 72 Cal.App.4th at p. 328, fn. 2 [quoting former § 527.8, subd. (a)].) Applying traditional legal principles governing prohibitory injunctions, this court concluded that to obtain a restraining order under the WVRO, there must be a "reasonable probability *the wrongful acts* will be repeated in the future." (*Id.* at p. 331, italics added.) Because the statute at the time defined the wrongful acts to include only unlawful violence or a credible threat of violence, the court ruled there must be a "reasonable probability *unlawful violence* will occur in the future." (*Id.* at p. 335, fn. 9, italics added.)

The WVRO statute has since been expanded to include "harassment" as one of the wrongful acts within its scope. (Sen. Bill No. 428 (2023–2024 Reg. Sess.); Stats. 2023, ch. 286, § 2.) This amended version of the statute became operative January 1, 2025 and was in effect at the time of the WVRO proceedings against Krause.[12] Accordingly, the *Scripps Health* standard of future harm—a "reasonable probability the wrongful acts will be repeated in

---

[12] We apply the version of section 527.8 that was effective on the date of the WVRO's issuance on March 19, 2025, which was the amended version enacted in 2023 and effective on January 1, 2025. (See *County of Los Angeles v. Niblett* (2025) 116 Cal.App.5th 454, 459, fn. 2 [applying "the version of the [WVRO] statute that was effective on the date of the order's issuance"].)

the future" (*Scripps Health, supra*, 72 Cal.App.4th at p. 331)—no longer requires a reasonable probability of *future unlawful violence.* Indeed, the Legislature's primary purpose in broadening the WVRO statute to encompass harassment was to authorize employers to obtain relief *before* "the situation reaches the point of including unlawful violence or a credible threat of violence." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 428 (2023-2024 Reg. Sess.) as amended Sept. 8, 2023, p. 4 (Rules Committee Analysis).) According to the author and sponsor of the 2023 bill, the problem it was designed to address was "that the employer [was] powerless to obtain a restraining order for an employee until the situation reache[d] the point of including unlawful violence or a credible threat of violence." (Rules Com. Analysis*, supra*, at p. 4.) "The author, sponsors, and supporters believe[d] this bill would enable employers to intervene sooner to spare their employees from having to endure this sort of harassment and to prevent it from escalating into something worse." (Rules Com. Analysis*, supra*, at p. 5.) Because the amended statute now covers harassment as well as violence, and the statutory definition of harassment does not require either violence or a threat of violence (§ 527.8, subd. (b)(4)), the threat of future harm may be satisfied under current law if there is a reasonable probability of continued harassment, even if it does *not* rise to the level of violence or a threat of violence.[13]

Applying this standard, we find sufficient evidence to support the WVRO. First, *Scripps Health* is factually distinguishable. That case arose

***

[13] Although his briefing suggested otherwise, Krause ultimately conceded at oral argument that a reasonable probability of future harassment is sufficient.

from a single meeting between hospital administrators and the defendant regarding the discharge of his mother from the hospital. (*Scripps Health, supra*, 72 Cal.App.4th at p. 328.) When an administrator insisted that the defendant stay in the room to discuss the dispute, and then stood in front of the door to prevent the defendant from leaving, the defendant opened the door, which hit the administrator and pushed her into the wall. (*Ibid*.) The trial court in *Scripps Health* vacated the temporary WVRO it granted under section 527.8 based on the defendant's express representation that he would stay away from the facility. (*Id.* at p. 336.) He also made no threats of violence and did not cause any violence after his mother was readmitted as a patient at the facility. (*Ibid.*) The defendant's mother later changed her insurance, making it unlikely she would return to the facility as a patient. (*Ibid.*) Under those circumstances, the Court of Appeal in *Scripps Health* reversed the trial court's grant of a permanent WVRO on the grounds that there was no reasonable probability that the acts of violence would recur. (*Ibid.*)

Unlike *Scripps Health*, which involved a one-time incident that was unlikely to recur, Krause's harassing behavior occurred multiple times, through multiple mediums, in multiple locations, and with multiple parties over a two-year period. His course of conduct included a pattern of stalking and texting behavior that was alarming and frightening to the victims. Moreover, Krause's contacts with the victims did not cease after he was placed on leave. Even after Krause was placed on leave in April 2024, he filed a sexual harassment complaint against X.L. that the District found to be unsubstantiated and Krause himself was unable to explain at the evidentiary hearing. X.L. also testified that around that time, Krause showed up at the Starbucks where she and I.P. were getting coffee and stared at them from his

24

car.  Later, Krause's campaign manager posted details about Krause's allegations against X.L. on social media, which Krause apparently did nothing to prevent or remedy.  Krause was ultimately elected to a position as a trustee on the Board, ensuring that the women were likely to encounter him in the course of their duties.

Second, as the trial court observed, for every instance of alleged misconduct, Krause's response was not to acknowledge that his actions may have been inappropriate, or that the women had any basis for feeling uncomfortable, fearful, or alarmed.  He also denied that he had an angry outburst at a meeting which multiple witnesses described as alarming.  The court could reasonably infer from his lack of insight or remorse that there was a reasonable probability Krause would continue to act in a way that would "seriously alarm[], annoy[], or harass" the women for "no legitimate purpose."  (§ 527.8, subd. (b)(4).)  The court expressly found that the District met its burden of proof "with respect to the potential for future harm."  "Absent indication to the contrary, we must presume that the trial court followed the applicable law" and "impliedly found that it was reasonably probable that future harassment would occur."  (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 500, 501.)  Viewing the totality of the evidence in the light most favorable to the order, we conclude there was sufficient evidence of future harm to support the issuance of the WVRO.

III

*Krause Forfeited His Parental Rights Claim*

We turn next to Krause's argument that the WVRO violates his parental rights.  Krause argues that the WVRO violates his parental rights because it prevents him from going to "his child's school or other District property for anything related to parent-student activities," and because "he

25

cannot even pick up his sick child from school because he is required to give the superintendent 48-hour prior notice." But as Krause acknowledges in his opening brief, "there was no evidence pertaining to Krause's conduct as a parent" presented at the hearing, and he did not raise any of these concerns below. The only evidence that Krause is even a parent came from fleeting references in X.L.'s testimony. She commented in passing that Krause said he has to pay child support, and in her rebuttal testimony, she said there was "a gentleman" at a Board meeting who "is the father of the child that Mr. Krause calls his kid."

Even assuming based on X.L.'s testimony that Krause does have a child, he asserted no request for a modification of the TRO or specific terms in the permanent WVRO to accommodate access to District property for parental purposes. Nor did he present any evidence that any child of his even attends school in the District. Accordingly, Krause has forfeited any challenge on that basis. (*Vascos Excavation Group LLC v. Gold* (2022) 87 Cal.App.5th 842, 856 [appellant forfeited argument not raised in the trial court]; see *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264 ["The rule is designed to advance efficiency and deter gamesmanship."]; *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected."].)

Krause argues he did not forfeit the issue because he had "no reason to believe, prior to receiving the WVRO in writing (after the trial concluded), that [his] parental rights were being violated." Yet the WVRO petition itself requested personal conduct and stay-away orders barring Krause from entering or being within 100 yards of the women's workplace and identifying the District as their employer. Moreover, the trial court summarized the

terms of the WVRO at the conclusion of the hearing and Krause asserted other objections to it but mentioned nothing about parental rights. Thus, Krause had adequate notice to assert any claim of parental rights and forfeited it by failing to do so in the trial court.[14]

IV

*The Provision of the WVRO Prohibiting Krause from Commenting on the WVRO or the WVRO Proceedings at Regular Board Meetings is Overbroad and Violates the First Amendment*

Krause also contends that the WVRO is overbroad and violates his First Amendment rights because it states that he "may not comment upon this [WVRO] or these proceedings at or on the record of any regular Board meeting." We agree that this portion of the WVRO is invalid because it restricts Krause's speech as an elected Board member and is broader than necessary to achieve the aims of the statute.

The First Amendment to the United States Constitution provides that Congress shall make no law "abridging the freedom of speech." This fundamental right to free speech applies to the states through the due process clause of the Fourteenth Amendment. (*In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1427.)

The portion of the WVRO prohibiting Krause from commenting on the WVRO or the WVRO proceedings at regular Board meetings implicates his First Amendment speech rights as an elected Board member. "A primary goal of the First Amendment is 'to protect the free discussion of governmental

_____

14      We express no view on any right Krause may have to seek a modification of the WVRO in the trial court to accommodate any parental rights he now wishes to exercise.

27

affairs.' " (*Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 376, quoting *Mills v. Alabama* (1966) 384 U.S. 214, 218–219.) Under the First Amendment, elected officials are given the widest latitude to express their views on matters of public interest in public meetings. (See *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 423; see also *Levy v. City of Santa Monica* (2004) 114 Cal.App.4th 1252, 1255 ["The First Amendment protects everyone, even politicians."].)

The trial court explained that it was issuing this portion of the order because it believed the WVRO proceedings against Krause were "not relevant to school business." But this is not necessarily so. By way of example, Krause points out that this portion of the order would prevent him from discussing in a regular Board meeting "his first-hand experience with the law firm that prosecuted the WVRO lawsuit or this appeal when its contract comes up for renewal, when payment of the legal bills comes up for approval, or when the firm is considered for additional services." Likewise, Krause's personal experience could be relevant if the Board were asked to authorize litigation by the District to obtain a WVRO against someone else. In its current form, the WVRO would prevent Krause from fully explaining his views on these issues to the extent they are based on his own experience in the WVRO proceedings.

"[A] court must tread lightly and carefully when issuing an order that prohibits speech." (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1159 (*Balboa Island*).) " 'An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ "means that broadly stifle fundamental personal liberties

28

when the end can be more narrowly achieved." [Citation.] In other words, the order must be tailored as precisely as possible to the exact needs of the case.' " (*Ibid*.) An injunction restricting speech must be " 'no broader than necessary to achieve its desired goals.' " (*Ibid*., quoting *Madsen v. Women's Health Ctr.* (1994) 512 U.S. 753, 765.)

We conclude that this portion of the WVRO is broader than necessary to achieve its desired goals because it prohibits *any* comments about the WVRO or WVRO proceedings, not just statements that would constitute threats or harassment. The aim of the WVRO is to put an end to the harassment, not to silence Krause in the performance of his duties as an elected Board member. While we recognize that an injunction forbidding the repetition of expression that has been judicially determined to be unlawful does not constitute a prohibited prior restraint of speech (*Balboa Island, supra*, 40 Cal.4th at p. 1153), the injunctive relief still must not sweep too broadly. (*Id*. at pp. 1160–1161 [injunction prohibiting repetition of speech found to be defamatory was not an invalid prior restraint but was "broader than necessary" in part because it prevented defendant from "presenting her grievances to government officials"]; see also *Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, 831–833 [portion of domestic violence restraining order prohibiting husband from posting about his divorce case on Facebook constituted overbroad, invalid restraint on his freedom of speech].)

Although we will vacate this portion of the WVRO as overbroad, we emphasize that this does not give Krause license to misuse his position as a Board member to harass the protected parties. Other remaining portions of the WVRO still prohibit Krause from harassing the women, disturbing their peace, or contacting them directly or indirectly. There is no exception to those other provisions for statements made or actions taken in Board

29

meetings. In other words, Krause would still be in violation of the WVRO if he were to make statements or engage in conduct in Board meetings that harass the women, disturb their peace, or constitute direct or indirect contact with them. We conclude that these other provisions are sufficient to achieve the goals of the WVRO and prevent further harassment without also imposing a blanket ban on any speech by Krause about the WVRO or the WVRO proceedings in Board meetings.

V

*The Duration of the WVRO Must be Modified to the Three-Year Statutory Maximum*

Krause's last contention, that the WVRO's four-year duration violates section 527.8, also has merit. Section 527.8, subdivision (l)(1), provides in relevant part that "an order issued after notice and hearing under this section may have a duration of not more than three years, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party." The District cites section 527.6 to support its argument that an order may have a four-year duration, but that section governs CHROs, which constitute an entirely separate category of restraining orders. Accordingly, we modify the WVRO to limit its duration to the statutory maximum of three years, subject to early termination under the terms of the original order.

DISPOSITION

The March 19, 2025 WVRO is modified as follows: (1) the following provision in Attachment 8(a)(9) is vacated: "Restrained Party may not comment upon this Order or these proceedings at or on the record of any regular Board meeting"; and (2) the WVRO is ordered to expire three years from the date of issuance, rather than four years, subject to early termination

30

under the terms of the original order.  The WVRO is affirmed as so modified. The parties shall bear their own costs on appeal.


BUCHANAN, J.

WE CONCUR:

DO, Acting P. J.

CASTILLO, J.